UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                     :
C.U. and N.U., individually and on   :
behalf of G.U.,                      :     13 Civ. 5209 (DLC)
                                     :
               Plaintiffs,           :
       -v-                           :     OPINION AND ORDER
                                     :
NEW YORK CITY DEPARTMENT OF EDUCATION,:
                                     :
               Defendant.            :
                                     :
------------------------------------- X

APPEARANCES:

For the Plaintiffs:

Nancy Hampton
573 Grand Street, Suite D604
New York, NY 10002

For the Defendant:

Lesley Berson Mbaye
Assistant Corporation Counsel for the City of New York
100 Church Street
New York, NY 10007


DENISE COTE, District Judge:

     Plaintiffs C.U. and N.U. (the "Parents"), on behalf of

their minor child G.U. (the "Student"), bring this action

pursuant to the Individuals with Disabilities Education Act, 20

U.S.C. §§ 1400 et seq. (the "IDEA").[1]  The plaintiffs seek review

---

[1] Congress amended the IDEA by enacting the Individuals with
Disabilities Education Improvement Act of 2004 ("IDEIA"), Pub.
L. No. 108-446, 118 Stat. 2647, which took effect on July 1,

of the June 7, 2013 administrative decision of State Review Officer Stephanie Deyoe ("SRO") reversing the July 2, 2012 decision of Impartial Hearing Officer Robert Briglio ("IHO") awarding reimbursement for the cost of the Student's 2011-2012 educational program in a private school.

The plaintiffs move for summary judgment, seeking an order reversing the SRO Decision and reinstating the IHO's award of reimbursement.  Defendant, the New York City Department of Education ("DOE"), cross-moves for summary judgment, seeking an order upholding the SRO Decision and dismissing the plaintiffs' complaint.

For the reasons set forth below, the plaintiffs' motion for summary judgment is granted.  The plaintiffs have shown that the DOE violated two of their procedural rights: the DOE failed to give the plaintiffs a copy of the Individualized Education Plan ("IEP") before the commencement of the 2011-2012 school year, and the DOE failed to provide an opportunity for the plaintiffs to inquire whether the assigned school had certain features which were material to the IEP and the child's educational rights under the IDEA.

---

2005.  Courts, however, continue to refer to the amended Act as the IDEA.  Except where noted, the statutory citations in this Opinion are to the IDEA as amended by the IDEIA.

STATUTORY BACKGROUND

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected."  20 U.S.C. §§ 1400(d)(1)(A) & (B); see also Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239-40 (2009) (discussing the purposes of the IDEA); Winkelman ex rel. Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 523 (2007) (same).  Additionally, the IDEA expresses a "strong preference for educating disabled students alongside their non-disabled peers; that is, in their least restrictive environment ('LRE')."  C.L. v. Scarsdale Union Free Sch. Dist., 744 F.3d 826, 831 (2d Cir. 2014) (citation omitted). States receiving federal funding under the IDEA are required to make a FAPE available to all children with disabilities residing in the state.  20 U.S.C. § 1412(a)(1)(A).

To this end, the IDEA requires that public schools create for each student covered by the Act an IEP for the student's education at least annually.  20 U.S.C. § 1414(d)(2)(A).  The IDEA envisions "the IEP as the centerpiece" of how a state delivers a FAPE.  Honig v. Doe, 484 U.S. 305, 311 (1988).

"[T]he IEP sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." Id. "In developing a particular child's IEP, a [school] is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 224 (2d Cir. 2012) (citation omitted).  "That IEP must be developed in accordance with the procedures laid out in the IDEA, and must be 'reasonably calculated to enable the child to receive educational benefits.'" T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., No. 12-4301, ___ F.3d ___, 2014 WL 1303156, at *1 (2d Cir. Apr. 2, 2014) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982)).

In New York City, the DOE is charged with providing a FAPE to all students with disabilities between the ages of three and twenty-one who reside in the City, and with developing the IEP for these students by convening local Committees on Special Education ("CSE").  N.Y. Educ. L. § 4402.  CSEs "are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular

or special education teacher, a school board representative, a parent representative, and others." C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ., 746 F.3d 68, 72 (2d Cir. 2014) (citing N.Y. Educ. L. § 4402(1)(b)(1)(a) & N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 8, § 200.3(a)).

The IDEA requires that parents be provided an opportunity to present a complaint with respect to the identification, evaluation, or placement of their child through the IEP process. 20 U.S.C. § 1415(b)(6)(A).  Where the parents believe that the school district has not adequately responded to their complaints, the IDEA requires that they be given an opportunity to pursue their grievances through an "impartial due process hearing."  Id. § 1415(f)(1)(A).  In New York, these hearings are conducted by an IHO, and parties aggrieved by the IHO's decision may appeal to an SRO.  See N.Y. Educ. L. § 4404; 20 U.S.C. § 1415(g)(1) (permitting "any party aggrieved by the findings and decision rendered [by the hearing officer] [to] appeal such findings and decision to the State educational agency").

The IDEA further provides that the final administrative decision may be reviewed "in a district court of the United States" by "bring[ing] a civil action with respect to the complaint."  20 U.S.C. § 1415(i)(2)(A).  The district court is empowered to "receive the records of the administrative

5

proceedings," to "hear additional evidence," and to "grant such relief as the court determines is appropriate" based on "the preponderance of the evidence" before it.  Id. § 1415(i)(2)(C); see also Forest Grove, 557 U.S. at 239 (noting that the IDEA "gives courts broad authority to grant 'appropriate' relief").

When a state receiving federal funding for special education fails to give a disabled child a FAPE under the IDEA, the child's parents or guardians may unilaterally place the child in an appropriate private school and seek tuition reimbursement from the state.  See Sch. Comm. of Burlington, Mass. v. Dep't of Educ., 471 U.S. 359, 369-70 (1985) ("Burlington"); Florence County Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7, 12 (1993) ("Carter").  Under the Burlington-Carter test for tuition reimbursement, "the parents will be entitled to reimbursement if (1) the school district's proposed placement violated the IDEA, (2) the parents' alternative private placement was appropriate, and (3) equitable considerations favor reimbursement."  T.M., 2014 WL 1303156, at *2 (citation omitted); see also Forest Grove, 557 U.S. at 246-47 ("Parents are entitled to reimbursement only if a federal court concludes both that the public placement violated IDEA and the private school placement was proper under the Act . . . [a]nd even then courts retain discretion to reduce the amount of a

reimbursement award if the equities so warrant . . . ." (citation omitted)).  Finally, "[u]nder New York law, at the due process hearing, the Department bears the burden of establishing the validity of the IEP, while the parents bear the burden of establishing the appropriateness of the private placement." C.F., 746 F.3d at 76 (citing N.Y. Educ. Law § 4404(1)(c)).


FACTUAL BACKGROUND

        The following facts are taken from the parties' submissions and the underlying administrative record, and are undisputed unless otherwise indicated.  Plaintiffs C.U. and N.U. are the Mother and Father, respectively, of the Student.  At the onset of the 2011-2012 school year, which is at issue in this case, the Student was fifteen years old.  The Student is classified as a student with autism and is a "child with a disability" under the IDEA.  See 20 U.S.C. § 1401(3)(A)(i).


I. The Student's Background and Seizure Disorder

        In addition to autism, the Student suffers from another disability: severe retractable seizure disorder.  This disorder began at the age of seven and manifests in multiple seizures a week, and sometimes multiple seizures in the same day.  Smaller seizures do not generally require medication to be administered,

but larger or successive seizures do.

The Student's seizure disorder has proven a challenge to get under control, and she has been examined by approximately thirty different doctors and been prescribed approximately thirty different medications. Medication does not, however, prevent the onset of the seizures, which are difficult to predict. Most significantly for present purposes, the seizure disorder is the primary cause of the Student's behavioral issues, namely aggression towards others and self-injurious behavior. Some schools have not been willing to accept the Student, stating that they do not have the facilities, staff, or services to manage her seizures.

Prior to the 2010-2011 school year at issue here, the DOE had never made a public school placement for the Student. For nursery school through fifth grade, the Student attended three private school programs (funded by the DOE), all of which either explicitly or effectively used a Developmental, Individual-Difference, Relationship-Based model ("DIR"), a special education teaching methodology based on following the lead of the child to help the child develop communication skills and to create social relationships. The Student progressed, both socially and academically, in these programs.

For sixth grade, the 2007-2008 school year, the Student was

placed in the private school, Imagine Academy ("Imagine"), also
funded by the DOE.  Imagine used DIR, but it also used the
Applied Behavior Analysis ("ABA") model, which differs from DIR
in that it is more structured and focuses less on development
and more on correcting problematic behaviors.  According to the
Mother, the Student's experience at Imagine was "[a]wful."  The
Student did well with DIR teaching but her seizures increased
dramatically with the ABA teaching, to the point where the
Student was having three or four seizures each day.  Moreover,
Imagine's staff was not capable of anticipating or responding to
the seizures.  In March of 2009, Imagine advised the Parents
that they were using aversive restraints on the Student.  The
Parents withdrew the Student from the school immediately.
During her time at Imagine, the Student had regressed
significantly and become almost nonverbal.

Between March and December 2009, the Student received home
instruction while the DOE attempted to find a placement.  The
DOE made certain program recommendations, but the identified
schools did not accept the Student, either because no seat was
available or out of concern regarding the Student's seizure
disorder.  In December 2009, the Parents placed the Student at
the Rebecca School ("Rebecca"), which uses the DIR method.  The
DOE funded the Rebecca placement for the remainder of the 2009-

9

2010 school year, as well as for the 2010-2011 school year. During that approximate 18 months at Rebecca, the Student made progress, both emotionally and academically.

At Rebecca, the staff has been trained to manage the Student's seizures in a number of ways.  First, the staff tries to anticipate possible triggers for her behavior, and minimize those triggers as they arise (e.g., by moving her to a quiet space) to prevent a seizure from occurring.  Second, if a seizure does occur, the other students are removed from the space, chairs and tables are moved out of the way, and an adult stays with the Student until the seizure passes and she feels safe.  The staff is also trained to differentiate small seizures from large ones; the latter call for medical intervention from a nurse and may require contacting the Parents.

II. The CSE Meeting and the Student's IEP

On March 2, 2011, the CSE met to develop the Student's IEP for the 2011-2012 school year.  The CSE consisted of: (1) the Student's Parents, (2) Feng Ye ("Ye"), a certified special education teacher serving also as district representative; (3) Rose Fochetta ("Fochetta"), a district psychologist; (4) a parent representative; (5) a social worker from Rebecca; and (6) the Student's current teacher at Rebecca.  The CSE considered

three sources: an April 2009 DOE evaluation of the Student, a
December 2010 interim report from Rebecca, and a November 2010
classroom observation conducted by Ye.  The April 2009
evaluation states that the Student had been referred for an
evaluation by her Parents upon her school's request to obtain a
"one to one paraprofessional for her in school."

A draft IEP had been prepared for the meeting, based
largely on the academic and social functioning levels and goals
set forth in the 2010 Rebecca report.  The draft was read aloud
and modified to reflect concerns expressed by the Parents and
current teacher.  The CSE considered and rejected a staff ratio
of 12:1+1, i.e., 12 children, 1 teacher, and 1 assistant.  It
also considered and rejected an 8:1+1 ratio.  It also considered
and rejected a 6:1:1 ratio without a one-on-one crisis
management paraprofessional ("1:1 crisis para") as
insufficiently supportive.[2]

According to the minutes, the Mother also voiced concerns

---

[2] The IEP document in the record states that the CSE determined
that a 6:1+1 ratio with a 1:1 crisis para was insufficient
supportive.  As explained by Fochetta in her testimony, this is
a typo, as the word "with" should have been written as
"without."  Although the Parents initially raised a concern
regarding this issue in their Due Process Complaint, no party
currently disputes that this was, in fact, a typo.

about the Student's seizure activity.  No specific educational
programs were discussed, as the placement was to be determined
after the IEP had been finalized.  After the meeting, the
modified draft IEP was typed up into final form.

The relevant portions of the final IEP can be summarized as
follows.  The IEP classifies the Student as autistic and notes
her seizure disorder.  It recommends a 12-month placement in a
special education classroom with a 6:1+1 ratio, and a 1:1 crisis
para.  The IEP also recommends various related services, such as
occupational training, speech therapy, and counseling.

In the category of "Social/Emotional Performance," the IEP
describes the Student's current performance as follows: when
regulated in a favorable environment, the Student is able to
interact with others and express emotions.  The Student can
become dysregulated easily and, in extreme times of
dysregulation, may become aggressive or self-injurious.  The
Student's behavior "seriously interferes with instruction and
requires additional support."  In identifying the Student's
needs on these issues, the IEP recommends, inter alia, access to
a quiet environment; refocus by a calm, soothing adult; a 1:1
crisis para; and counseling services.  It further notes that a
behavior intervention plan ("BIP") has been developed.

The BIP lists the Student's problematic behaviors as

12

"significant anxiety that impedes her ability to function."  It
states that this anxiety manifests in her heavy breathing,
facial tics, biting her wrists, banging her arms, and swatting
at others.  It notes that her seizure activity may result in
behavioral concerns.  The BIP describes the Student's goals as
follows: "[The student] will demonstrate a reduction in anxiety,
which will lead to a reduction in aggressive and self injurious
behaviors."  Another goal reads: "[The student] will become more
aware of her negative behaviors in order to reduce them."  The
BIP's recommended strategies and supports include the 1:1 crisis
para, limiting changes to the Student's visual environment, and
taking breaks.

Finally, in the category of "Health and Physical
Development," the IEP describes the Student's present health
status as follows.  It notes her seizure disorder and that she
may need medication at school if she experiences multiple
seizures in the same day.  It further notes her sensitivities to
loud noises, light, and touching.  It lists medication under
Student's medical needs.  In listing the Student's health and
physical development needs, the IEP states that the Student
"will need rest time after a seizure," that occupational therapy
continues to be warranted, and that a nurse should be on site to
administer medication when needed for seizures.

13

On March 4, two days after the CSE meeting, the Parents signed a 12-month consent form, consenting for the Student to receive education services in July and August for the 2011-2012 school year.  Accordingly, the 2011-2012 school year for the Student was set to begin on July 5, 2011.

A document dated March 2, 2011, the same date as the CSE meeting, and titled "Notice of Recommended Deferred Placement," states that, because the IEP was for the next school year, the DOE recommends deferring the Student's placement until June 15, 2011.  It states that the Parents will receive a Final Notice of Recommendation ("FNR") notifying the Parents of the specific school placement on or before June 15, 2011.  It further states that if the Parents wish to visit a sample of the type of program recommended, they could contact Nancy Funke ("Funke"), and provides Funke's telephone number and address.

III. The Student's Recommended Placement

In a letter dated June 14, 2011, the Parents wrote to Funke to advise that, as of that date, they had not received a copy of the IEP or the FNR with the recommended school placement.  This letter did not yield a response.

The Parents left for a vacation from on or about June 18 through June 27.  On or about June 18, the FNR -- which was

14

dated June 14, 2011 -- arrived at the Parents' home.

The FNR sets forth the IEP's general educational recommendation (e.g., 6:1+1 staffing ratio and a 1:1 crisis para) and identifies a placement at "M79@P79" located on 55 East 120th Street in Manhattan, New York.  M79@P79 is the Horan School ("Horan").  The FNR states that a copy of the IEP is attached.  The FNR further states that, if the Parents wish to discuss this final recommendation further, they could contact Funke or Gerard Donegan ("Donegan"), the chairperson of the Student's CSE, to arrange a meeting.  The FNR notes that the law provides the Parents with certain rights, including procedural safeguards, in connection with this recommendation, referring them to a document, titled "A Parent's Guide to Special Education for Children, 5-21."  The FNR concludes by stating that, if the Parents do not contact Funke or Donegan by June 28, the recommended changes will be put into effect.

Prior the Parents' departure, they had prepared a "10-day notice letter" stating that the DOE had not developed an appropriate IEP and that the Parents were placing her in Rebecca and would be seeking reimbursement.  That letter, dated June 22, was mailed by Parents' counsel to Donegan on the same day.

On June 27, upon their return from vacation, the Parents received the FNR, which did not have an IEP attached to it, and

15

attempted to contact Horan.  The Mother called the school's
telephone number and received a message stating that the
voicemail was full and asking the caller to call back.  The
Mother called back the same day, received the same message, and
called twice a day every day thereafter until July 4.  Her calls
were not returned.

Additionally, in a letter dated June 29 and faxed the same
day, the Parents wrote to Donegan (with Funke copied) stating
they had repeatedly attempted to contact Horan since June 27 and
that the voicemail system was not accepting messages indicating
that the voicemail box was full.  The Parents further stated
that they would continue to attempt to reach the Horan vice
principal.  In a separate letter dated and faxed the same day,
the Parents wrote to Donegan (with Funke copied) stating that
they had still not received the Student's final IEP for the
2011-2012 school year.  These letters too did not yield a
response.

On July 5, the first day of the 12-month school year for
2011-2012, the Parents placed the Student in Rebecca and paid
the first deposit of $10,000.  Another payment for $20,000 was
made on July 22.  The Parents eventually received the IEP
sometime in August.

16

IV. The Parents' Due Process Complaint

On September 19, the Parents filed a Due Process Complaint ("Complaint"), seeking reimbursement for the tuition and expenses for the Rebecca placement for the 2011-2012 school year.  The Complaint alleges several procedural and substantive violations that denied the Student a FAPE as follows:

In November 2010, the DOE conducted a 30-minute classroom observation of the Student.  The DOE did not perform any testing of the Student's current level of functioning.

At the March 2 meeting, the CSE recommended a 12-month program with a 6:1+1 ratio but did not advise the Parents of a specific school location.

On June 18, two weeks before the school year was to begin, the Parents received the recommendation for the placement at Horan.  The Parents made numerous attempts to contact Horan but were unable to leave a message because the voicemail was full. The Parents also contacted the CSE office by telephone, fax, and overnight mail but did not receive a response.  Furthermore, notwithstanding their letters of June 14 and June 29, the Parents did not receive the Student's IEP until August.

Additionally, the 6:1+1 staff ratio, even with a 1:1 crisis para, is insufficiently supportive.  The Student has never required the services of a 1:1 crisis para in the past.

17

Moreover, a 1:1 crisis para is overly restrictive.[3]

V. The IHO Proceedings and Decision

The IHO hearing was conducted in three sessions held between January and April 2012.  The DOE's primary witness was Fochetta, who testified that 6:1+1 programs are structured and well-organized and would provide the very small student-teacher ratio that the Student needs.  She also testified that CSE considered the 1:1 crisis para recommendation "at length" and determined that, given the Student's aggression and other difficulties, the Student needed one-on-one support.  On cross-examination, Fochetta admitted that she could not describe the training of a 1:1 crisis para.

The DOE also presented testimony from Jaclyn Ortega ("Ortega"), the parent coordinator at Horan.  Ortega admitted on cross-examination that Horan may have been transitioning

_____

[3] The Complaint also raises an objection based on the DOE's failure to include parent training and counseling in the IEP. While the IHO concluded that this argument was waived, the SRO reversed that decision and held that the DOE erred by failing to include parent training and counseling in the IEP, as required by New York regulations.  8 NYCRR §§ 200.4(d)(2)(v)(b)(5) & 200.13(d).  This determination has not been appealed, and thus the SRO's remedial order that the next CSE must consider the issue of parent training and counseling remains undisturbed.

telephone services or setting up voicemail in between June 27 and July 5, 2011.  Furthermore, Ortega testified that Horan waits for parents to contact the school after an FNR is sent. Additionally, Ortega testified that Horan usually acquires its copy of the IEP from the parents.  She affirmed that Horan never received the IEP for the 2011-2012 school year for the Student.

Finally, Funke testified, confirming that a seat at Horan was available on July 5.  She could not recall whether or not she received the Parents' letters of June 14 and June 29, asking for the IEP and advising her about the challenges getting in touch with Horan.

The Parents presented three witnesses: the Mother, the program director at Rebecca, and the Student's teacher at Rebecca.  The information conveyed through much of this testimony is not in dispute and has been summarized above.  As relevant here, the Rebecca director testified that the Student did not require a 1:1 crisis para because her issues were medical, not behavioral.  The Rebecca teacher similarly testified that the Student has not required a 1:1 crisis para at Rebecca.

The IHO rendered a 31-page decision on July 2, 2012, finding both procedural and substantive violations of the IDEA and granting reimbursement to the Parents.  The IHO began by

19

rejecting two procedural objections based on the DOE's alleged failure to properly assess the Student's functioning for the 2011-2012 school year, and its failure to perform a Functional Behavioral Assessment ("FBA") prior to the school year.  The IHO found that the November 2009 evaluation, when considered in conjunction with the "very detailed" December 2010 Rebecca report, was sufficient to establish the Student's functioning. These same materials were sufficient to establish the Student's social and emotional functioning, as well as behavioral issues, thus obviating the need for an FBA.

The IHO concluded, however, that the Parents were "deprived of a meaningful opportunity to participate in the program and placement decisions" for the Student for the 2011-2012 school year.  The IHO explained that, because school placement was not and could not have been discussed at the March 2, 2011 CSE meeting because no member of the CSE was sufficiently knowledgeable or qualified to discuss school placement at the meeting, crucial issues going to the substantive adequacy of the Student's FAPE (e.g., the school's teaching methodology, the availability of a quiet room for seizures, and the training of the 1:1 crisis para with respect to seizures) could not be addressed at the CSE meeting.  These issues could only be addressed after the school placement was determined.  The IHO

concluded that the Parents had a procedural right to be heard on those issues, which entailed the right to meet with school staff and view the proposed placement.

The IHO found that the Parents were denied this procedural right.  The DOE waited months to make a school placement, and the FNR was not received until June 18, when the Parents were on vacation.  Upon their return, the Parents were diligent in attempting to contact Horan before July 5, but no one at Horan or the DOE responded to their inquiries.  Additionally, citing the Mother's testimony, the IHO found that the Parents "apparently" did not receive the IEP until August.  Accordingly, the IHO concluded that the Parents' procedural rights were violated and further that the violation rose to the level of a denial of a FAPE.

The IHO also found the IEP itself to be substantively inadequate.  He concluded that there was "insufficient evidence that the 6:1+1 [ratio] with a 1:1 [crisis] para and related services is appropriate for the [Student], because there is no evidence supporting the use of a 1:1 [crisis] para to address the student's seizures and concomitant behaviors."  The IHO also found that the DOE failed to demonstrate how the Student's needs could be met with a "reduction in support" from the 8:1+4 ratio at Rebecca to the 6:1+1 ratio at Horan.

21

Having found both procedural and substantive violations of the IDEA, the IHO proceeded to the second and third elements of the Burlington-Carter test.  He found that the Rebecca placement was "appropriate" given the Student's past and current progress at the school.  He further found that equitable considerations supported tuition reimbursement, because the Parents had participated in the CSE meeting and diligently attempted to contact Horan and the DOE before placing the Student in Rebecca. The DOE appealed.

VI. The SRO Appeal and Decision

The SRO rendered a 17-page opinion on June 7, 2013, reversing the IHO's determination that DOE denied the Student a FAPE for the 2011-2012 school year.  As to the procedural violation, the SRO concluded that the IHO erred in two ways. First, the SRO interpreted the IHO's suggestion that the CSE members were not qualified to advise the Parents as to certain issues as positing that the CSE was not properly constituted. The SRO concluded that the CSE was properly composed.

Second, the SRO concluded that no procedural violation resulted from the Parents' inability to participate in the school selection process.  She held that parents have no right to participate in school selection, relying on T.Y. v. N.Y.C.

22

Case 1:13-cv-05209-DLC   Document 31   Filed 05/27/14   Page 23 of 55

Dep't of Educ., 584 F.3d 412, 419-20 (2d Cir. 2009), and R.E. v.
N.Y.C. Dep't of Educ., 694 F.3d 167, 191-92 (2d Cir. 2012).  In
so holding, the SRO determined that the Parents did not have a
legal right to visit the recommended school, notwithstanding
certain DOE statements to the contrary.

In the same discussion, the SRO addressed the issue of the
late provision of the IEP.  The SRO observed that the record was
"unclear" as to whether the IEP was provided on time and assumed
that its delivery was "improperly delayed."  The SRO found that
this procedural violation did not rise to a violation of FAPE
entitling the Parents to reimbursement.

As to the substantive violation, the SRO determined that
the IEP recommendation of a 6:1+1 ratio, combined with the 1:1
crisis para, was appropriate for the Student.  The SRO relied on
evidence in the record suggesting that the Student had
behavioral issues and needed one-on-one assistance, and noted
that the IEP set forth specific interventions to help manage the
Student's seizure disorder.  Moreover, to the extent that any
specific training was required to address the Student's seizure
issues, the SRO stated that there was no evidence that the Horan
staff would not have been so trained.  As to the reduction in
instruction, the SRO concluded that the IEP recommendation need
not be best-in-class but merely appropriate, which it was here.

23

Having concluded that there was no IDEA violation, the SRO did not reach the second and third elements of the Burlington-Carter test.

VII. District Court

On July 25, 2013, the plaintiffs filed the present action, seeking review of the SRO Decision and reimbursement of the 2011-2012 school year.[4]  On November 29, the Parents moved for summary judgment.  On January 10, the DOE cross-moved for the same.  The motions were fully submitted as of February 12, 2014.

DISCUSSION

Although the parties have styled their submissions as motions for summary judgment, "the procedure is in substance an appeal from an administrative determination, not a summary judgment."  Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005) (citation omitted).  As such, summary judgment in IDEA cases "often triggers more than an inquiry into possible disputed issues of fact."  Id.  Rather, the court conducts an "independent" review of the administrative

---

[4] The New York State Department of Education, and its Commissioner, John B. King, Jr., were initially named in this action.  On December 2, 2013, they were voluntarily dismissed.

24

record, basing its decision on the "preponderance of the evidence." Rowley, 458 U.S. at 205 (citation omitted). Summary judgment thereby "serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in IDEA." Lillbask, 397 F.3d at 83 n.3 (citation omitted). "The standard of review requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete de novo review." C.F., 746 F.3d at 77 (citation omitted).

Nevertheless, "[t]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed," id., and courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." C.L., 744 F.3d at 838 (citation omitted). Because "[f]ederal courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy, . . . district courts must accord deference to state administrative agencies when reviewing their IDEA decisions." Id. (citation omitted).

> The deference owed, however, is not absolute as it
> will hinge on the kinds of considerations that
> normally determine whether any particular judgment is
> persuasive, for example whether the decision being
> reviewed is well-reasoned, and whether it was based on
> substantially greater familiarity with the evidence
> and the witnesses than the reviewing court.

Id. (citation omitted).  "[A]s a general matter, when an IHO and
SRO reach conflicting conclusions, we defer to the final
decision of the state authorities, that is, the SRO's decision."
Id. (citation omitted).  "Where the SRO's decision, however, is
insufficiently reasoned to merit that deference and the IHO's
decision is more thorough and carefully considered, the
reviewing court may consider and defer to the IHO's decision."
Id. (citation omitted).

     The key issue in this case pertains to the first element of
the Burlington-Carter test, i.e., whether the DOE's placement
for the Student violated the IDEA, either procedurally or
substantively.  Before reaching that issue, however, this
Opinion must first address the DOE's position that a number of
the Parents' arguments are waived.

I. Scope of Review

     The DOE contends that the plaintiffs are barred from
litigating the following arguments for failure to properly raise
them in the Due Process Complaint: (1) that the CSE team did not
include a member who was knowledgeable about the recommended
school placement; (2) that the IEP did not properly address the
Student's seizure disorder; and (3) the Parents were unable to
participate in the selection of the recommended school.

The IDEA provides that "[t]he party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the [complaint], unless the other party agrees otherwise."  20 U.S.C. § 1415(f)(3)(B).  Accordingly, district courts in this Circuit have typically held that the scope of the inquiry of the IHO, and therefore also of the SRO and this Court, is limited to matters either raised in the plaintiffs' Due Process Complaint or agreed to by the defendant.

The Circuit has very recently clarified, however, that "the waiver rule is not to be mechanically applied."  C.F., 746 F.3d at 78.  The Circuit explained that "[t]he key to the due process procedures is fair notice and preventing parents from sandbagging the school district by raising claims after the expiration of the resolution period."  Id. (citation omitted).  Moreover, it noted that the "IDEA itself contemplates some flexibility" as the statute does not require "that alleged deficiencies be detailed in any formulaic manner" and "the waiver rule limits only what may be raised at the due process hearing."  Id. (citation omitted).  In applying this holding in C.F., the Circuit held that arguments not directly raised in a Due Process Complaint were not foreclosed because (1) the Due Process Complaint "provided fair notice to the Department of"

27

the argument at issue; (2) "both the IHO and SRO reached the issue on the merits, giving [the federal court] a record for review"; or (3) the argument goes to "the heart of this dispute." Id.

Even under the more plaintiff-friendly standard set forth in C.F., the first argument challenged by the DOE, relating to the CSE composition, is not properly before this Court. Nothing in the Complaint would put DOE on notice that the Parents were making an independent procedural challenge to the composition of the CSE. Nor does the composition issue go to the heart of this dispute, as the principal procedural challenge and substantive challenge discussed below are independent of the CSE composition issue. Additionally, it is not the case that both the IHO and SRO reached this issue. The IHO merely discussed the issue of CSE composition to establish a minor, and essentially undisputed point relating to the Parents' procedural objection to the school placement. The IHO was not addressing an independent procedural violation based on the composition of the CSE. Notwithstanding the fact that the SRO addressed the CSE composition issue, there is an insufficient record for this Court to consider the argument.

The remaining two arguments challenged by the DOE are properly before this Court, however. As to the seizure

disorder, the DOE had proper notice of the Parents' concerns, as
the Complaint states that the 6:1+1 ratio, with a 1:1 crisis
para, recommended by the IEP is "insufficiently supportive."
This is also how the IHO read the Complaint.  As to parental
participation in the school selection process, the Complaint
more than adequately put the DOE on notice of this objection, as
it specifically described the Parents' inability to contact
Horan and the CSE between June 27 and July 5.  Moreover, as to
both arguments, the IHO and the SRO reached the issues, giving
this Court a full record to review.  Thus, under C.F., only the
first of the challenged arguments is waived.


II. The DOE Violated the IDEA.

     As set forth above, the Burlington-Carter test consists of
three elements, the first of which concerns whether the DOE
violated the IDEA.  This element has both a procedural and
substantive component:

          At the first step, courts examine whether there were
     procedural violations of the IDEA, namely, whether the
     state has complied with the procedures set forth in
     the IDEA.  Procedural violations only entitle parents
     to reimbursement if they impeded the child's right to
     a free appropriate public education, significantly
     impeded the parents' opportunity to participate in the
     decisionmaking process, or caused a deprivation of
     educational benefits.  Second, courts examine whether
     the IEP was substantively adequate, namely, whether it
     was reasonably calculated to enable the child to

receive educational benefits.  Substantive inadequacy
automatically entitles the parents to reimbursement.

C.F., 746 F.3d at 78-79 (citation omitted).  This Opinion
addresses the procedural and substantive issues in turn.


A. The DOE Committed Two Procedural Violations.

The Parents raise three procedural violations that are not
waived: (1) the DOE failed to provide the IEP to the Parents at
the beginning of 2011-2012 school year; (2) the Parents were
denied a meaningful opportunity to participate in the school
placement decision; and (3) the DOE failed to assess the
Student's current levels of performance.  This Opinion concludes
that the first two procedural violations occurred and rise to
the level of a denial of a FAPE.

To properly discuss these violations, some background on
the procedural protections afforded by the IDEA is necessary.
The IDEA "establishes various procedural safeguards that
guarantee parents both an opportunity for meaningful input into
all decisions affecting their child's education and the right to
seek review of any decisions they think inappropriate."  Honig,
484 U.S. at 311-12 (1988) (emphasis added); see also Rowley, 458
U.S. at 205 (describing the procedural protections in the IDEA
as "giving parents and guardians a large measure of

30

participation at every stage of the administrative process"
(emphasis added)).  Many of these safeguards provide for
parental participation in the development and revision of the
IEP.  See Winkelman, 550 U.S. at 524 (compiling the relevant
provisions); see also Schaffer v. Weast, 546 U.S. 49, 53 (2005)
(same).  Additionally, the IDEA "sets up general procedural
safeguards that protect the informed involvement of parents in
the development of an education for their child."  Winkelman,
550 U.S. at 524.  Chief among these is the requirement that
states and localities receiving federal funding "establish and
maintain procedures in accordance with this section to ensure
that children with disabilities and their parents are guaranteed
procedural safeguards with respect to the provision of a free
appropriate public education by such agencies."  20 U.S.C.
§ 1415(a).  Section 1415 of the IDEA also sets forth a non-
exhaustive list of these general safeguards, which include, as
relevant here:

> (1) An opportunity for the parents of a child with a
> disability to examine all records relating to such
> child and to participate in meetings with respect to
> the identification, evaluation, and educational
> placement of the child, and the provision of a free
> appropriate public education to such child, and to
> obtain an independent educational evaluation of the
> child.
>
> . . .

31

(6) <u>An opportunity for any party to present a</u>
<u>complaint</u> --

    (A) <u>with respect to</u> any matter relating to the
identification, evaluation, or educational
placement of the child, or the <u>provision of a</u>
<u>free appropriate public education to such child</u>
. . . .

20 U.S.C. § 1415(b). (Emphasis added.)  In sum, "[t]he core of

the statute . . . is the cooperative process that [the IDEA]

establishes between parents and schools." <u>Schaffer</u>, 546 U.S. at

53.

    "[T]he importance Congress attached to the[] procedural

safeguards [in the IDEA] cannot be gainsaid." <u>Rowley</u>, 458 U.S.

at 205.

    [T]he congressional emphasis upon full participation
of concerned parties throughout the development of the
IEP, as well as the requirements that state and local
plans be submitted to the Secretary for approval,
demonstrates the legislative conviction that adequate
compliance with the procedures prescribed would in
most cases assure much if not all of what Congress
wished in the way of substantive content in an IEP.

<u>Id.</u> at 206.  In short, "[t]he initial procedural inquiry in

an IDEA case is no mere formality." <u>C.F.</u>, 746 F.3d at 81

(citation omitted).


    <u>1. DOE Failed To Provide the IEP in Timely Fashion.</u>

    The Parents' rights were violated when the DOE failed to

provide them with the IEP before the commencement of the 2011-
2012 school year on July 5, 2011.  THE SRO erred in rejecting
this claim.

     Under IDEA regulations, the DOE must have the IEP in place
by the beginning of the school year.  34 C.F.R. § 300.323(a).
Additionally, a copy of the IEP must be provided to the parents
at no cost.  Id. § 300.322(f).  Additionally, the DOE "must
ensure that . . . [t]he child's IEP is accessible to each
regular education teacher, special education teacher, related
services provider, and any other service provider who is
responsible for its implementation."  Id. § 300.323(d)(1).

     These regulations were not complied with.  The DOE was on
notice that the Student's 2011-2012 school year began on July 5,
2011, as the DOE had provided the consent forms to a 12-month
school year, which began on July 5.  The IHO, although he did
not separately consider this asserted procedural violation,
found that the DOE "apparently never sent a copy of the IEP
before the school year started."  Additionally, the IHO relied
on that finding in concluding that equitable considerations
favored the Parents and warranted reimbursement.  Moreover,
Horan never received a copy of the Student's IEP; rather, Horan
generally relies on parents to provide a copy of the IEP, which
the Parents did not have.  Because neither the Parents nor Horan

33

possessed the document constituting the "centerpiece" of a child's education under IDEA, this procedural violation impeded the child's right to a free appropriate public education.  This satisfies the first element of the Burlington-Carter test.

The SRO devoted a portion of her decision to rejecting the proposition that the late provision of the IEP constituted a procedural violation justifying reimbursement.  The SRO held that the late provision of the IEP did not give rise a FAPE violation because it did not impede the Parents' ability to participate in the CSE process or cause a deprivation of educational benefits.

The SRO's analysis is legally flawed.  While no regulation specifically states that the IEP must be provided to parents at the beginning of the school year, it naturally follows from the regulations cited above.  Rejecting a parent's complaint that the IEP was not provided in a timely manner, the Second Circuit has observed that the DOE "fulfill[s] its legal obligations by providing the IEP before the first day of school."  Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 194 (2d Cir. 2005).  This is particularly necessary when, as here, the school district relies on parents to provide the school with a copy of the IEP.

Adopting the reasoning of the SRO, the DOE argues that the

34

Parents were on actual notice of the contents of the IEP due to
their active participation in the March 2, 2011 CSE meeting.
The IDEA and its implementing regulations anticipate that
parents will participate in the CSE meeting.  The regulations
nevertheless require that parents receive a copy of the IEP,
which is the "centerpiece" of the IDEA scheme, in timely
fashion.  Thus, the regulations recognize that the procedural
right to an IEP cannot be satisfied by participation at the CSE
meeting.

The SRO also erred in determining that the DOE's failure to
provide the IEP by July 5 did not rise to a FAPE violation.  The
SRO failed to acknowledge the crucial fact, established by the
DOE's own witnesses, that Horan generally relied on parents to
provide it with the IEP and, in this case, did not receive a
copy of the IEP from the DOE.  As such, the failure to provide
the Parents with a copy of the IEP is not merely a technical
failure but a direct impediment to the provision of a FAPE by
the DOE at Horan.

Finally, the DOE suggests that both the IHO and SRO made
factual determinations that the IEP was received before July 5.
This is incorrect.  The IHO accepted the Parents' testimony that
the IEP was not received until after the school year began.  The
SRO merely observed that the record on the date of the receipt

35

was "unclear."  Given this record, the Court will not be the
first to find that the DOE provided the IEP to the Parents
before July 5, 2011.

### 2. The Parents Were Denied Right To Evaluate The School Placement.

The Parents also allege that their procedural rights were
violated when their attempts to inquire about the Horan
placement were ignored by Horan and the CSE.  This claim was
addressed by both the IHO and the SRO.  The IHO agreed with the
Parents and held that the Parents' procedural rights were
violated.  The SRO reversed, concluding that the Parents had no
right to participate in school selection, citing principally
T.Y., 584 F.3d at 419-20, and R.E., 694 F.3d at 191-92.

The SRO committed legal error.  This error was one of
framing, rather than application.  The SRO interpreted the
procedural right at issue as the right to participate in school
selection.  The Parents' contention, as also described by the
IHO, is that they have at least some procedural right to
participate in the school selection process.

This Court agrees.  As set forth above, the Supreme Court
has specifically recognized that parents have a broad right to
participate in all decisions affecting a child's education, a
right that is reflected in the breadth of the IDEA provisions

36

cited above.  Because the procedural protections in the IDEA are
intended to ensure substantive outcomes, see Rowley, 458 U.S. at
206, it follows that parents have a procedural right to evaluate
the school assignment, i.e., the right to acquire relevant and
timely information as to the proposed school.[5]

With regard to the Student here, crucial issues going to
the substantive adequacy of the FAPE could not be established at
the March 2, 2011 CSE meeting because school placement had not
yet been determined.  As set forth in the IEP, because of the
Student's seizure disorder, any school had to have quiet place
to recover from seizures and a nurse on-site to administer
medication.  Thus, inasmuch as the school placement in this case
raises issues that go directly to the substantive adequacy of
the DOE's proposed FAPE for the Student, and inasmuch as the
Supreme Court has explained that the procedural protections in
the IDEA are broad and intended to ensure that parents have an

---

[5] This Opinion does not reach the question of whether the
procedural right to such information implies any further
procedural rights to petition the CSE if the parents believe the
proposed school does not satisfy the IEP.  It appears, however,
that some of this may be accomplished by 20 U.S.C.
§ 1412(a)(10)(C)(iii)(I), which generally conditions
reimbursement on parents having notified the school district of
their concerns with the public school placement before placing
their child in a private school.

opportunity to give meaningful input on all substantive issues, the Parents had at least a procedural right to inquire whether the proposed school location had the resources set forth in the IEP.

This procedural right was violated here.  As the IHO found, the DOE provided an FNR on June 18, just days before the 2011-2012 school year began for the Student on July 5.  Notably, the DOE had previously promised that the FNR would be received no later than June 15.  The FNR stated that, if the DOE did not hear from the Parents by June 28, the proposed recommendation would be put into place.  Upon the Parents' return from vacation on June 27, they immediately and diligently set about attempting to contact the recommended school.  They were unable to leave a message with the school, possibly because it was changing its voicemail software.  Their challenges in reaching the recommended school were documented in letters they wrote and faxed to the CSE explaining their problems.  The CSE did not respond to any of these letters.[6]  Having been unable to arrange

---

[6] These findings are based on the IHO's conclusions after having heard from both the Parents and the DOE's witnesses.  Given the IHO's greater familiarity with the evidence, these findings are entitled to deference.  Moreover, the DOE has not pointed to evidence that the IHO overlooked that would contradict these findings.

a visit to Horan or to inquire about its facilities or programs, the Parents enrolled the Student in Rebecca on July 5.  These delays and lack of response by the DOE violated the Parents' procedural right to evaluate the school placement so that they could make an informed decision about the child's school. Because this violation significantly impeded the Parents' opportunity to participate in the decision making process concerning the provision of the FAPE, this procedural violation constitutes a denial of a FAPE and satisfies the first element of the Burlington-Carter test.

The SRO's error -- framing the procedural right as the right to participate in school selection, as opposed to the right to participate in the school selection process by acquiring relevant information -- is fatal.  Specifically, the Second Circuit cases on which the SRO relied, T.Y., 584 F.3d at 419-20, and R.E., 694 F.3d at 191-92, do not hold that parents have no procedural rights with respect to the school selection process.

In T.Y., the parents argued that the DOE's policy of not specifying a particular school in the IEP deprived them of a right to meaningful participation in the IEP's development.  584 F.3d at 419.  The Circuit, after considering the various procedural provisions cited by the parents, concluded that

39

"there is no requirement in the IDEA that the IEP name a specific school location." Id. at 420.  In so holding, the Circuit held that the term "educational placement," as used in the IDEA and related regulations, refers "to the general educational program -- such as the classes, individualized attention and additional services a child will receive -- rather than the 'bricks and mortar' of the specific school." Id. at 419.

The Circuit emphasized, however, the narrow nature of its holding.  It was "not holding that school districts have carte blanche to assign a child to a school that cannot satisfy the IEP's requirements." Id. at 420.  It was merely "hold[ing] that an IEP's failure to identify a specific school location will not constitute a per se procedural violation of the IDEA." Id.  The Circuit cited a Fifth Circuit case, which had assumed arguendo that parents have a right to provide some input as to school locations.  White ex rel. White v. Ascension Parish Sch. Bd., 343 F.3d 373, 379-80 (5th Cir. 2003).

R.E. is similarly narrow in its holding.  In R.E., the parents argued that the DOE committed a procedural violation by failing to inform them of the exact school at which their child would be placed at the IEP meeting or in the final IEP.  694 F.3d at 191.  The Circuit explained that the DOE's practice was

40

to:

> provide general placement information in the IEP, such
> as the staffing ratio and related services, and then
> convey to the parents a final notice of
> recommendation, or FNR identifying a specific school
> at a later date.  The parents are then able to visit
> the placement before deciding whether to accept it.

Id.  Citing T.Y., the Circuit rejected the parents' argument,

holding that "[t]he Department may select the specific school

without the advice of the parents so long as it conforms to the

program offered in the IEP."  Id. at 191-92.  Thus, in R.E., the

Circuit declined to find a procedural right to notice of a

school placement in an IEP, but in circumstances in which the

parents would have eventual notice of the school placement and

an opportunity to visit the school before the school year

commenced.

Thus, neither T.Y. nor R.E. holds that parents have no

procedural rights with respect to school placement.  Indeed,

both cases may be read as endorsing the position, consistent

with the Supreme Court precedent discussing the breadth of the

IDEA procedural protections, that when the identity of the

school and its resources are relevant to the FAPE determination,

parents have a procedural right to evaluate the school to assess

whether it can be reasonably expected to satisfy the child's

IEP.

The Parents also contend that the SRO committed error when she found that parents have no "right to visit" a school placement.  The DOE advises the parents of special education students that they will have a "right" to visit a proposed school,[7] yet takes the position that these promised "rights" are not enforceable under the IDEA.  See D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ., 480 F.3d 138 (2d Cir. 2007) (noting that states and localities can provide greater protections than those promised under the IDEA, so long as they do not "conflict[] directly" with federal law).

Although the IHO described the procedural violation as including the "right to visit" Horan, it is not necessary to reach that issue here.  At its heart, the procedural right that the Parents claim was violated was not their right to visit Horan physically but rather their right to acquire relevant information about the Horan placement.  Indeed, the relevant information here, i.e. resource availability, could have been

---

[7] E.g., New York City Dep't of Educ., A Shared Path to Success: A Parent's Guide to Special Education Services for School-Age Children, at 30 (2012-2013) ("As the parent, you have the right to visit the site recommended in the Prior Written Notice."), available at http://schools.nyc.gov/NR/rdonlyres/DBD4EB3A-6D3B-496D-8CB2-C742F9B9AB5C/0/ParentGuidetoSpecialEd_090712_English.pdf; id. at 48 ("Right to Visit a Class: Parents have the right to visit the school where their child will receive special education services.").

acquired by telephone or an alternate means; no physical visit
was required.  Thus, to the extent that the IHO recognized a
"right to visit" a school placement, and the SRO and DOE dispute
the existence of such a right, it is not necessary to reach that
specific issue to conclude that the Parents' procedural right to
evaluate a school placement was violated here.

### 3. The DOE Did Not Err In Failing To Conduct Updated Functional Testing.

The Parents allege a third procedural violation.  They
argue that the DOE erred by failing to conduct an updated
evaluation of the Student, even though the Parents expressed
their belief that an updated evaluation was required at the
March 2 CSE meeting.

Federal and state regulations require a district to conduct
an evaluation of students receiving special education or related
services at least once every three years unless the parents and
the district agree otherwise.  See 20 U.S.C. §1414(a)(2)(B).  In
developing an IEP, a CSE is directed to "review existing
evaluation data on the child, including -- (i) evaluations and
information provided by the parents of the child; (ii) current
classroom-based, local, or State assessments, and classroom-
based observations; and (iii) observations by teachers and

related services providers." Id. § 1414(c)(1)(A).  "[O]n the basis of that review," a CSE must then "identify what additional data, if any, are needed to determine," among other things, "the present levels of academic achievement" of a student.  Id. § 1414(c)(1)(B).  Any additional assessments need only be conducted if found necessary to fill in gaps in the initial review of existing evaluation data.  Id. § 1414(c)(2).

The IHO addressed this issue and concluded that the fact that the DOE failed to conduct a current reevaluation of the Student did not deny the Student a FAPE.  He found that the CSE had sufficient information to formulate the Student's present levels of functioning in the IEP.  In making this determination, the IHO engaged in a thorough review of the materials that the CSE used to assess the Student's abilities: the November 2009 evaluation, as well as the December 2010 Rebecca report.  He also considered the testimony presented at the hearing and did not credit the Parents' testimony that they raised a concern regarding the appropriateness of the evaluations at the March 2 CSE meeting.

The IHO's careful decision is entitled to deference.  The Rebecca report is "very detailed," and provides a holistic assessment of the Student's needs across a wide variety of academic, social, and behavioral functions.  Moreover, because

44

the report was developed in December 2010, it reflected a very recent assessment of the Student's needs as of the March 2011 CSE meeting.  This report served as the baseline for much of the IEP, and it is undisputed that the Parents and teacher participated significantly in modifying the draft IEP to better reflect the Student's current needs.  Thus, the preponderance of the evidence indicates that the CSE had sufficient and accurate information to understand the Student's present levels of performance in preparing the IEP.[8]

### B. The IEP Was Substantively Adequate.

The Parents raise two substantive objections to the IDEA. Neither succeeds.  The first objection is that the IEP recommendation of a 6:1+1 ratio, even with a 1:1 crisis para, was insufficiently supportive of the Student.  Specifically, the Parents contend that a 1:1 crisis para is inappropriate for managing a seizure disorder, and that the IEP should have included support services by staff trained to manage the Student's seizure disorder.  The second objection is that the assignment of a 1:1 crisis para is overly restrictive.

---

[8] The Parents' argument relies largely on its substantive objection that the assignment of a 1:1 crisis para is overly restrictive, and is addressed below.

A FAPE must provide "special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (citation omitted). Nevertheless, the IDEA does not require that an IEP furnish "every special service necessary to maximize each handicapped child's potential." Rowley, 458 U.S. at 199. "The purpose of the [IDEA] was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." Walczak, 142 F.3d at 130 (citation omitted). Therefore, a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is "likely to produce progress, not regression," and "afford[s] the student with an opportunity greater than mere trivial advancement." M.H., 685 F.3d at 224 (citation omitted).

"[B]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." T.Y., 584 F.3d at 418 (citation omitted). "[I]n order for the district court to conduct an independent review of the sufficiency of an IEP under the IDEA that does not impermissibly meddle in state educational methodology, it must

46

examine the record for objective evidence that indicates whether the child is likely to make progress or regress under the proposed plan." <u>Gagliardo v. Arlington Cent. Sch. Dist.</u>, 489 F.3d 105, 113 (2d Cir. 2007) (citation omitted). "[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." <u>Grim v. Rhinebeck Cent. Sch. Dist.</u>, 346 F.3d 377, 382 (2d Cir. 2003).

### (1) The SRO's Determination that the IEP Was Adequate for the Student's Seizure Disorder Is Entitled To Deference.

In contrast to the IHO, the SRO rejected the Parents' objection to the IEP's designation of a 1:1 crisis para of the Student, instead of staff members specially trained in addressing the Student's seizure disorder.  This conclusion warrants deference and is supported by the record.

The SRO observed that the IEP identified the Student's seizure disorder, describing its characteristics and noting the Student's need for an on-site nurse to administer medication. As to the testimony that the Rebecca staff were "trained" to address the Student's seizure disorder, the SRO determined that "the hearing record contains no reason to believe that, had the student attended the district school, the district would not

47

have appropriately trained its staff to adequately address the student's needs."  The SRO further stated that the IEP's description of the post-seizure interventions for the Student -- rest time, a discussion of events in her environment to help the student process information, and access to a quiet environment -- are similar to those provided by Rebecca when the Student experiences a seizure.  Thus, the SRO concluded that the IEP recommendation, i.e., a 6:1+1 staffing ratio with a 1:1 crisis para, was reasonably calculated to meet the Student's needs.

The Parents' principal argument is to assert that the DOE failed to present any evidence that a 1:1 crisis para can adequately address the Student's seizure disorder.  This misstates the record.  The DOE established that a 1:1 crisis para will, by definition, provide one-on-one support for the Student.  Moreover, Fochetta testified that the 1:1 crisis para would be guided by the IEP, which describes the necessary interventions for the Student when a seizure occurs, e.g., being placed in a quiet room to rest, discussing the events and environment to help the Student become comfortable, and soliciting a nurse to deliver medication when necessary.  This evidence is sufficient to support the SRO's conclusion that the 1:1 crisis para can adequately respond to the Student's seizure

48

disorder.

### (2)  The Assignment of a 1:1 Crisis Para Is Not Overly Restrictive.

The Parents next raise the substantive objection that the assignment of a 1:1 crisis para is overly restrictive.  The IHO did not address this argument.  The SRO rejected the argument, pointing to the evidence in the record regarding the Student's significant behavior issues -- i.e., the aggression and the self-injurious behaviors -- and the Student's need for one-on-one attention and adult support to mitigate these issues.  The SRO concluded that the hearing record does not support the conclusion that the presence of a 1:1 crisis para would hinder the Student's progress.

The SRO's conclusion warrants deference and is well supported by the record.  The evidence overwhelming establishes that the Student's seizure disorder and its concomitant behaviors are a significant aspect of the Student's educational needs.  Having established above that the assignment of a 1:1 crisis para is appropriate for responding to these seizures, it cannot be contended that the assignment is overly restrictive. Thus, contrary to the Parents' insistence otherwise, the 1:1 crisis para is a necessary component of the Student's IEP,

because it addresses the crucial issue of the Student's seizures.

Moreover, the test for substantive adequacy is whether the proposed IEP will produce regress, as opposed to progress. The only evidence in the record suggesting that the assistance provided by a 1:1 crisis para will hamper the Student's progress is the Mother's testimony that a 1:1 crisis para is not "appropriate" for a "16-year-old who is trying to be independent." Parents certainly have an important role to play in the development of an IEP for their child, but this single sentence of testimony is insufficient to warrant overturning the SRO's determination.

The Parents further note the testimony of the Rebecca Director and teacher, who stated that the Student does not "require" a 1:1 crisis para generally and that the Student has not required such an intervention at Rebecca. That a Student does not require a particular intervention fails to demonstrate that the intervention will lead to regression. Accordingly, the substantive objections to the IEP fail.

III. The Parents' Placement Was Appropriate and Equity Warrants
Reimbursement.

Finally, the Court turns to the second and third elements
of the Burlington-Carter test, i.e., whether the Rebecca
placement was appropriate for the Student and whether equitable
considerations warrant reimbursement here.  The IHO concluded
both issues in favor of the Parents.  The DOE does not challenge
the second here, only the third.

 "[B]ecause the authority to grant reimbursement is
discretionary, equitable considerations relating to the
reasonableness of the action taken by the parents are relevant
in fashioning relief."  Frank G. v. Bd. of Educ. of Hyde Park,
459 F.3d 356, 363-64 (2d Cir. 2006) (citation omitted).
"Important to the equitable consideration is whether the parents
obstructed or were uncooperative in the school district's
efforts to meet its obligations under the IDEA."  C.L., 744 F.3d
at 840.  Additionally, the text of the IDEA provides that
reimbursement "may be reduced or denied"

        (I) if--

                (aa) at the most recent IEP meeting that the
                parents attended prior to removal of the child
                from the public school, the parents did not
                inform the IEP Team that they were rejecting the
                placement proposed by the public agency to
                provide a free appropriate public education to
                their child, including stating their concerns and
                their intent to enroll their child in a private

school at public expense; or

> (bb) <u>10 business days</u> (including any holidays
> that occur on a business day) <u>prior to the</u>
> <u>removal of the child from the public school, the</u>
> <u>parents did not give written notice</u> to the public
> agency of the information described in item (aa);

(II) if, prior to the parents' removal of the child
from the public school, the public agency informed the
parents, through the notice requirements described in
section 1415(b)(3) of this title, of its intent to
evaluate the child (including a statement of the
purpose of the evaluation that was appropriate and
reasonable), but the parents did not make the child
available for such evaluation; or

(III) upon a judicial finding of unreasonableness with
respect to actions taken by the parents.

20 U.S.C. § 1412(a)(10)(C)(iii) (emphasis added); <u>see also</u> <u>M.C.</u>
<u>ex rel. Mrs. C. v. Voluntown Bd. of Educ.</u>, 226 F.3d 60, 68 (2d
Cir. 2000) (recognizing that "reimbursement is barred where
parents unilaterally arrange for private educational services
without ever notifying the school board of their dissatisfaction
with their child's IEP").

The IHO determined that equitable considerations favor
reimbursement.  He noted that the Parents were cooperative with
the DOE, providing consents to evaluations and participating in
the CSE meeting in developing the IEP.  He found that the
Parents "diligently attempted to visit the placement in June."
He faulted the DOE for waiting until a few weeks before the
school year to send the FNR, and for "apparently" never sending

a copy of the IEP to the Parents.  Furthermore, he did not find
that the Parents' June 22, 2011 letter, in which the Parents
advised the DOE that they intended to place the Student in
Rebecca, or the Parents' decision to sign a contract with
Rebecca constituted a failure to cooperate with the DOE,
particularly as the Parents lacked the IEP and an opportunity to
visit the proposed school placement.  Accordingly, the IHO
concluded that equity favored reimbursement.

    The IHO's determination as to the equities warrants
deference, especially as the SRO did not reach this issue.  See
C.L., 744 F.3d at 840.  Moreover, the IHO's decision is
supported by the record, which -- accepting the IHO's factual
determinations -- suggests that the Parents acted diligently and
were cooperative.  It was the DOE that was unresponsive to the
Parents' repeated inquiries.  In such circumstances, equity does
not favor the DOE.

    The DOE offers only one response.  It argues that
reimbursement is not warranted because the Parents sent their
"notice" letter on June 22, 2011, which is less than ten
business days before the July 5 start of the school year,
violating 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb).  According to
the definition of a "business day" set forth in this provision,
the Parents provided notice nine business days before removing

53

the Student from the public placement.

The DOE's argument fails, for at least two reasons.  First, 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb) sets forth a circumstance in which reimbursement "may" be denied.  The failure to provide a full ten days notice of the Parents' decision does not, in the context of this case, suggest that this Court should exercise its discretion to deny reimbursement.  Second, one purpose behind this provision was to prevent parents from acquiring reimbursement where they had entirely failed to notify the DOE of their concerns with the IEP.  See M.C., 226 F.3d at 68.  That concern does not arise here, as the Parents did provide notice to the DOE.  The Parents' delay in giving notice is explained in part by the DOE's failure to provide the IEP to the Parents.  Thus, equity supports an order of reimbursement here.

CONCLUSION

The plaintiffs' November 29, 2013 motion for summary judgment is granted, and the defendant's January 10, 2014 cross-motion for summary judgment is denied.  The Clerk of Court shall enter judgment for the plaintiffs and close this case.


        SO ORDERED:

Dated:     New York, New York
           May 27, 2014

                         _____
                              DENISE COTE
                     United States District Judge